## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| **MICHAEL DATTOLICO**<br>**and JOAN DATTOLICO,** | **Civil Action No.:** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **JOHNSON & JOHNSON**<br>**AND ETHICON, INC.,** | |
| **Defendants.** | |

### COMPLAINT

Plaintiffs, Michael Dattolico and Joan Dattolico (hereinafter "Plaintiffs"), by and through their undersigned counsel, brings this Complaint for damages against Ethicon, Inc. ("Ethicon"), and Johnson and Johnson ("J&J"), (collectively "Defendants") and, in support thereof, states the following:

This is a medical device tort action brought on behalf of the above-named Plaintiff Michael Dattolico arising out of the failure of Defendants' hernia mesh product, the Ethicon Proceed Ventral Patch ("Proceed" or "Ethicon Multi-Layered Hernia Mesh"). As a result, Plaintiffs have suffered permanent injuries and significant pain and suffering, emotional distress, lost wages and earning capacity, and diminished quality of life.  Plaintiffs respectfully seek damages in excess of $75,000 for all damages to which they may be legally entitled.

## STATEMENT OF PARTIES

1.      Plaintiffs are, and were, at all relevant times, citizens and residents of Pinellas County, Florida and the United States.

2.      Defendants J&J and Ethicon designed, manufactured and supplied to doctors multi-layered hernia mesh, including the Proceed (also referenced herein as "Ethicon Multi-Layered Hernia Mesh").

3.      Defendant J&J is incorporated and based in New Jersey. J&J is a multinational marketer, promoter, seller, producer, manufacturer, and developer of medical devices.  J&J is a corporation incorporated in New Jersey, and according to its website, the world's largest and most diverse medical device and Diagnostics Company, with its principal place of business located at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey.

4.      Defendant J&J organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its products, including but not limited to its hernia repair Proceed. Within J&J there are three sectors: medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." J&J charged the Ethicon Franchise with the design, development, promotion, marketing, testing, training, distribution and sale of the Proceed and Physiomesh, the hernia repair products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Gary Pruden, is employed by J&J. The companies which comprise the Ethicon Franchise are thus controlled by Defendant J&J and include Ethicon, Inc.

5.      Defendant Ethicon is a wholly owned subsidiary of Defendant J&J.  Defendant Ethicon is a corporation incorporated in the State of New Jersey with its principal place of business located at Route 22 West, Somerville, New Jersey.

6.      Defendant Ethicon is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices including Ethicon Multi-Layered Hernia Mesh. Defendants are individually, jointly and severally liable to Plaintiff for damages suffered by Plaintiff arising from the Defendants' design, manufacture, marketing, labeling, distribution, sale and placement of its defective Ethicon Multi-Layered Hernia Meshes at issue in the instant suit, effectuated directly and indirectly through their respective agents, servants, employees and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

7.      J&J, directly and/or through the actions of Ethicon, has at all pertinent times been responsible for the research, development, testing, manufacture, production, marketing, promotion, distribution and/or sale of Ethicon Multi-Layered Hernia Mesh.

8.      All Defendants were also involved in the business of monitoring and reporting adverse events concerning the Ethicon Multi-Layered Hernia Mesh, and having a role in the decision process and response of Defendants, if any, related to these adverse events.

9.      Defendants are vicariously liable for the acts and/or omissions of their employees and/or agents who were at all times relevant hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

## VENUE AND JURISDICTION

10.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiffs and all Defendants.  The amount in controversy exceeds $75,000.00.

11.    This Court has personal jurisdiction over each of the Defendants pursuant to the Florida Long-Arm Statute, Fla. Stat. § 48.193. Defendants transact business within the State of Florida, contracted to sell and supply their Ethicon Multi-Layered Hernia Mesh in the State of Florida, and committed tortious acts and omissions in Florida.  Defendants' tortious acts and omissions caused injury to Plaintiff Michael Dattolico in the State of Florida.   Defendants employ sales representatives in the State of Florida to sell their Ethicon Multi-Layered Hernia Mesh throughout the State, including the Ethicon Multi-Layered Hernia Mesh product implanted in Plaintiff Michael Dattolico.   Defendants have purposefully engaged in the business of developing, manufacturing, publishing information, marketing, distributing, promoting and/or selling, either directly or indirectly, through third parties, as successor in interest, or other related entities, medical devices including Ethicon Multi-Layered Hernia Mesh throughout the United States, including within the State of Florida, for which they derived significant and regular income. The Defendants intended and reasonably expected that their defective Ethicon Multi-Layered Hernia Mesh would be sold and implanted in Florida and could cause injury in Florida.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1332 by virtue of the fact that (a) a substantial part of the events (including the Ethicon Proceed first mesh revision surgery) or omissions giving rise to the claims occurred in this District and (b) Defendants' products are sold to and consumed by individuals in the State of Florida, thereby subjecting

Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

14. [sic] 13. Defendants have and continue to conduct substantial business in the State of Florida and in this District, distribute Ethicon Multi-Layered Hernia Meshes in this District, receive substantial compensation and profits from sales of Ethicon Multi-Layered Hernia Meshes in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as so subject them to *in personam* jurisdiction in this District.

## PROCEED HISTORY

14. Defendants were the designers, manufacturers, marketers, distributors and suppliers of the Ethicon Proceed Ventral Patch at all material times.

15. Defendants warranted the Ethicon Multi-Layered Hernia Mesh and placed the device into the United States stream of commerce.

16. Defendants knew that the oxidized regenerated cellulose layer of the Ethicon Multi-Layered Hernia Mesh was ineffective at preventing adhesion formation to the underlying polypropylene of the Proceed before the Defendants set out to design the Proceed Ventral Patch in 2006, and even before Defendants set out to design the Proceed Surgical Mesh predicate device in 2003.

17. Before 2003, Defendants were aware that the Oxidized Regenerated Cellulose utilized in the Ethicon Multi-Layered Hernia Mesh had pores which were too large to prevent adhesion formation.

18. Before 2003, Defendants were aware that increased adhesion formation would result in increased mesh shrinkage.

19. Before 2003, Defendants were aware that utilizing Oxidized Regenerated

Cellulose in their mesh products would result in dense adhesions in the presence of blood or fibrinous exudate.

20.     Before 2003, Defendants were aware that polypropylene elicits a chronic, life-long inflammatory response that is accompanied by exudation of fibrinogen.

21.     Before 2003, Defendants were aware that any exposure to gamma radiation would weaken and embrittle the polypropylene of the Ethicon Multi-Layered Hernia Mesh.

22.     Before 2006, Defendants were aware that adding Vicryl and other additional layers to the Proceed Surgical Mesh to create the Proceed Ventral Patch, would increase the intensity and duration of inflammation and foreign body response (FBR), thus increasing fibrinous exudate.

23.     Before placing the Ethicon Multi-Layered Hernia Mesh on the market, Defendants were required to mitigate risks of the product, including any element of design or sterilization which could render the device ineffective, weaken the structural integrity of the device, or increase or prolong inflammation once the device is implanted that would result in an increase in adhesion formation, mesh shrinkage, pain, bowel complications, hernia recurrence, and/or the need for early surgical revision in patients-consumers.

24.     Defendants designed, manufactured, and marketed the Ethicon Multi-Layered Hernia Mesh, despite long-standing knowledge that the materials utilized in the Proceed would cause dense adhesions, chronic pain, mesh shrinkage, bowel obstructions, and early hernia recurrence.

25.     Defendants sterilized the Ethicon Multi-Layered Hernia Mesh with gamma radiation, despite long-standing knowledge that polypropylene will degrade and embrittle if exposed to any amount of gamma radiation.

26.     The Ethicon Proceed Ventral Patch is made of the following, starting with the component placed closest to the bowel of the patient-consumer:

- Oxidized Regenerated Cellulose (ORC) barrier layer
- Polydioxanone (PDS) film layer
- Large pore polypropylene (Prolene soft mesh)
- PDS film layer
- PDS reinforcing element
- PDS ring
- PDS film layer
- Vicryl
- PDS film layer

27.     Polypropylene hernia meshes are traditionally sterilized with ethylene oxide.

28.     The ORC layer of the Ethicon Multi-Layered Hernia Mesh will react and degrade in the presence of ethylene oxide.

29.     Defendants sterilize the Ethicon Multi-Layered Hernia Mesh with gamma radiation.

30.     Gamma radiation degrades, weakens, and embrittles the polypropylene base of the Ethicon Multi-Layered Hernia Mesh.

31.     Decades before the release of the Ethicon Multi-Layered Hernia Mesh, Defendants were aware that polypropylene degrades, weakens, and embrittles when exposed to gamma irradiation.[1]

32.     The embrittled polypropylene of the Ethicon Multi-Layered Hernia Mesh increases its propensity to tear away from the securing devices, such as sutures or tacks.

33.     The polypropylene base is the only permanent, non-resorbable portion of the Ethicon Multi-Layered Hernia Mesh.

34.     Defendants designed, manufactured, promoted, sold and/or marketed the Ethicon

---

[1] U.S. Patent No. 3,943,933 (Issued Mar. 16, 1976).

Multi-Layered Hernia Mesh to be utilized in anyone with a soft tissue defect, including, but not limited to: "infants, children, pregnant women, or women planning pregnancies…"[2]

35.     For decades, the medical community had concerns about severe complications if polypropylene was placed too close to the bowel or other underlying organs, due to the formation of dense adhesions to the polypropylene.

36.     Defendants were aware that the ORC layer in the Ethicon Multi-Layered Hernia Mesh was ineffective at preventing adhesion formation to polypropylene over a decade before Defendants brought the Ethicon Multi-Layered Hernia Mesh to market.[3]

37.     Despite significant evidence to the contrary, Defendants marketed the Ethicon Multi-Layered Hernia Mesh and its ORC layer as a tissue-separating barrier that would prevent adhesion formation from the underlying polypropylene to any nearby organs.

38.     The following studies have investigated complications associated with the Ethicon Multi-Layered Hernia Mesh:

>       a.     In 2006, a study out of The Netherlands evaluating the use of new prosthetic meshes for ventral hernia repair was published in Surgical Endoscopy. **Proceed showed significantly less incorporation… Proceed composite has a smooth surface designed to prevent adhesion formation. However, it is less smooth than other composite meshes with antiadhesive barriers. Furthermore, the barrier applied is oxidized cellulose, which may not prevent mesh adhesions as effectively as anticipated or as reported previously.**

>       Burger, J.W. et al, *Evaluation of New Prosthetic Meshes for Ventral Hernia Repair*. Surg Endosc. 20:1320 – 1325 (2006). DOI: 10.1007/s00464-005-0706-4.

>       b.     In 2009, a study out of The Netherlands on adhesions prevention during hernia mesh repair was published in the Annals of Biomedical Engineering. **The uncoated Prolene meshes were found to invoke a moderate inflammatory response in their immediate vicinity,**

---

[2] Proceed Ventral Patch Instructions for Use, RMC 8550915, Status 9/08.
[3] Robert J. Fitzgibbons, Jr., M.D. et al., *A Laparoscopic Intraperitoneal Onlay Mesh Technique for the Repair of an Indirect Inguinal Hernia*, 219-2 ANNALS OF SURGERY 114 (1994).

characterized by the presence of active macrophages. A stronger inflammatory response was observed with the Proceed meshes, presumably due to ongoing phagocytosis of the oxidizing regenerated cellulose and polydioxanone coating... Most remarkable were adhesions with Proceed. Although adhesion scores were the lowest at day 7, they increased by day 30 and exceeded adhesion scores of NVP/BMA-coated Prolene mesh and Prolene.

Emans, P. et al, *Polypropylene Meshes to Prevent Abdominal Herniation. Can Stable Coatings Prevent Adhesions in the Long Term?* Annals of Biomedical Engineering. 37(2):410 – 418 (2009). DOI: 10.1007/s10439-008-9608-7.

c.      In 2009, a study out of Saint Louis, Missouri measuring adhesions and mesh contraction was published by Surgical Innovation. The data was previously presented at the American Hernia Society, Third International Hernia Congress on June 9, 2006. **The highest degrees of mesh contraction occurred with DualMesh and Proceed... Proceed exhibited the greatest surface area of adhesion coverage and the highest-grade adhesions.**

Pierce, R. et al, *120-Day Comparative Analysis of Adhesion Grade and Quantity, Mesh Contraction, and Tissue Response to a Novel Omega-3 Fatty Acid Bioabsorbable Barrier Macroporous Mesh After Intraperitoneal Placement.* Surg Innov. (2009). DOI: 10.1177/1553350608330479.

d.      In 2010, a study out of Saint Louis, Missouri on adhesion related complications associated with intraperitoneal mesh was published in Surgical Endoscopy. **Nevertheless, there appears to be some differentiation in the adhesion characteristics of the absorbable-barrier-coated meshes... We noticed a similar increase in the adhesion tenacity score of PROCEED in a preclinical study of intraperitoneal placement f absorbable-barrier-coated meshes in a rabbit model.**

Jenkins, E. et al, *Prospective Evaluation of Adhesion Characteristics to Intraperitoneal Mesh and Adhesiolysis-Related Complications During Laparoscopic Re-Exploration After Prior Ventral Hernia Repair.* Surg Endosc. 24:3002 – 3007. DOI: 10.1007/s00464-010-1076-0.

e.      In 2010, a study out of Belgium on the lack of convincing data in medical literature regarding to use of intraperitoneal hernia mesh was published in The World Journal of Hernia and Abdominal Wall Surgery. The content of the paper was presented during the 32nd International Congress of the European Hernia Society, in Istanbul, on October 6-8,

2010. **After release of the omental adhesions, we found the [Proceed] mesh to have shrunk and folded up, to a dimension of approximately 3.0 cm in diameter. This means a shrinkage from a circle of diameter 6.4 cm (surface: 3.14 x $3.2^2$ = 32.2 $cm^2$) to a "circle" of diameter 3.0 cm (surface: 3.14 x $1.5^2$ = 7.1 $cm^2$), equivalent to a mesh surface shrinkage of 77.9%... There is a complete lack of convincing data on these mesh devices in the medical literature.**

Muysoms, F.E. et al, *Complications of Mesh Devices for Intraperitoneal Umbilical Hernia Repair: A Word of Caution*. Journal of Hernia. 15:463-468 (2011). DOI: 10.1007/s10029-010-0692-x.

f.      In 2012, a study out of Saint Louis, Missouri on the effectiveness of barrier hernia mesh was published in Surgical Endoscopy. **This study also demonstrated increased adhesion formation for all of the barrier mesh prostheses between 7 and 30 days, which the authors attributed to increased inflammation related to the degradation and resorption of the barrier layer components, which were ongoing between 7 and 30 days. This effect was most pronounced in PROCEED Surgical Mesh materials, which again highlights the influence that the chemistry of the particular barrier components may have over the inflammatory response and subsequent adhesion formation.**

Deeken, C. et al, *A Review of the Composition, Characteristics, and Effectiveness of Barrier Mesh Prostheses Utilized for Laparoscopic Ventral Hernia Repair*. Surg Endosc. 26:566-575 (2012). DOI: 10.1007/s00464-011-1899-3.

g.      In 2014, a study out of Belgium on the Proceed Ventral Patch (PVP) was published in The World Journal of Hernia and Abdominal Wall Surgery. **Polypropylene meshes, like the PVP, have demonstrated an in vivo centripetal shrinkage percentage of up to 77% in some patients. This finding of mesh contraction was confirmed in those patients. This finding of mesh contraction was confirmed in those patients that were re-operated for recurrence in 21% of the patients where the radiologist was able to visualize the mesh. The overlap obtained with a mesh of 6.4 cm in diameter is in sufficient with hernias larger than 2 cm. Therefore, we recommend not to use PVP in hernias of 2cm or more.**

Bontinck, J. et al, *Single Centre Observational Study to Evaluate the Safety and Efficacy of the Proceed Ventral Patch to Repair Small Ventral Hernias*. Journal of Hernia. 18:671 – 680 (2014). DOI: 10.1007/s10029-013-1140-5.

h.      In 2015, a study out of Belgium on the Proceed (PP/ORC) was

published in The World Journal of Hernia and Abdominal Wall Surgery. **In our opinion, there are several factors contributing to the extensive FBR and shrinkage/mesh contraction of the PP/ORC device. First, the composition of the PP/ORC device out of nine different layers will lead to a more extensive FBR. Second, absorption of 8 of these 9 layers will create a severe inflammatory reaction as, e.g.. shown with vicryl mesh absorption, also being one of the components of the PP/ORC device. A third possible explanation is delamination of the device.**

Reynvoet, E. et al, *Intraperitoneal Mesh Devices for Small Midline Hernias: Mesh Behavior in a Porcine Model*. Journal of Hernia. 19:955 – 963 (2015). DOI: 10.1007/s10029-015-1368-3.

i.      In 2016, a study out of Bosnia and Herzegovina was published by The Royal Belgian Society for Surgery. **The extent of [adhesion] site involvement after 28 days was statistically significantly greater in the Proceed group.**

Delibegovic, S. et al, *Formation of Adhesions After Intraperitoneal Applications of TiMesh: Experimental Study on a Rodent Model*. The Royal Belgian Society for Surgery. (2016). DOI 10.1080/00015458.2016.1179513

j.      In 2016, a study out of Germany on the adhesion prevention efficacy of Proceed (PCM) was published in International Journal of Medical Sciences. **PCM does not provide significant adhesion prevention.**

Winny, M. et al, *Adhesions Prevention Efficacy of Composite Meshes Parietex, Proceed, and 4DryField PH Covered Polypropylene Meshes in an IPOM Rat Model*. Int. J. Med. Sci. 13:936 – 941 (2016). DOI: 10.7150/ijms.16215.

k.      In 2017, a Proceed (PVP) randomized controlled trial out of The Netherlands was published in the World Journal of Surgery. **At this point, PVP device usage shows an easier and faster operating procedure. Nevertheless, this advantage is outweighed by the significantly higher incidence of early re-operations due to early complications.**

Ponten, J.E. et al, *Mesh Versus Patch Repair for Epigastric and Umbilical Hernia (MORPHEUS Trial); One-Year Results of a Randomized Controlled Trial*. World J. Surg. (2017). DOI: 10.1007/s00268-017-4297-8.

l.      In 2017, a study out of Brazil was published on adhesions and

collagen formation following mesh implantation. **The study follow-up time, 90 days, was established because there were no articles in the literature with prolonged follow-up… What we can formulate is that absorption of the regenerated oxidized cellulose exposes the polypropylene layer to the abdominal visceral content and that this consequently led to the adhesions found… The adhesion formation is a complex process and is basically started by the tissue injury process which breaks down the balance between coagulation and fibrinolysis. Fibrin deposition results in a matrix where the fibroblasts produce extracellular matrix. The end process generates various degrees of adhesion… In the present study, type III collagen was expressed more in the coated group and based on the result of the research this could increase hernia formation.**

Rossi, L. et al, *Peritoneal Adhesions Type I, III and Total Collagen on Polypropylene and Coated Polypropylene Meshes: Experimental Study in Rats*. ABCD Arq Bras Cir Dig 30(2):77 – 82 (2017). DOI: 10.1590/0102-6720201700020001.

## FAILURE TO WARN PHYSICIANS OF THE DANGERS ASSOCIATED WITH ETHICON MULTI-LAYERED HERNIA MESH

39.     Defendants marketed the Ethicon Multi-Layered Hernia Mesh to general surgeons, hospitals, and group purchasing organizations (GPOs), rather than end-user patients.

40.     Defendants had the ability to inform surgeons, hospitals, or GPOs of developing problems or defects in its devices through e-mail, letter, recalls, warnings in product inserts, and/or through its product representatives, who work directly with the surgeon.

41.     The multiple layers of the Ethicon Multi-Layered Hernia Mesh increase the intensity and duration of the inflammatory response. That response in turn increases dense adhesion formation from underlying organs to the Ethicon Proceed, resulting in bowel complications, mesh contracture, hernia recurrence, increased foreign body reaction, chronic severe pain, and more.

42.     Defendants state in the Proceed IFU that "The PROLENE Soft Mesh component is constructed of knitted filaments of extruded polypropylene identical in composition to that

used in PROLENE Polypropylene Suture, Nonabsorbable Surgical Suture, U.S.P." This statement is false, or at very least misleading, as the Proceed undergoes gamma irradiation that changes the composition of the polypropylene.

43.     Defendants also state in the Proceed IFU that the polypropylene material "when used as a suture, has been reported to be non-reactive and to retain its strength indefinitely in clinical use. The PROLENE Soft Mesh affords excellent strength, durability and surgical adaptability, with a porous structure to enable mesh incorporation into surrounding tissues." This statement is false, or at the very least misleading, as Defendants are aware that the Ethicon Proceed is reactive and does not retain its strength. Furthermore, Defendants are aware of reports that the small polypropylene sutures do elicit a small reaction, and increasing amounts of polypropylene greatly increase such reaction. The very reason the Defendants added the ORC layer to the Prolene Soft Mesh was to protect organs from reacting with the polypropylene of the Prolene Soft Mesh.

44.     The Proceed IFU has a section for contraindications, which list "None known."

45.     The Proceed IFU has a section for adverse reactions, which list "Potential adverse reactions are those typically associated with surgically implantable materials…" The polypropylene base of the Ethicon Multi-Layered Hernia Mesh carries many potential adverse reactions, such as a life-long inflammatory response that other surgically implantable materials do not present. Additionally, the multiple layers of the Ethicon Multi-Layered Hernia Mesh further increase the inflammatory response and rate of infection, adhesion formation, chronic pain, seroma formation, fistula formation, hematomas, mesh contracture, hernia recurrence, mesh migration, bowel complications, foreign body response, extrusion, and other additional injuries.

46.     The Proceed IFU notes that "Selected mesh size should allow for adequate

overlap of the fascial defect on all sides." The IFU never defines what constitutes "adequate overlap." Defendants are aware that the Proceed shrinks over time, with reports of the Proceed shrinking as much as 77%.

47.     Defendants failed to warn that the Ethicon Multi-Layered Hernia Mesh will elicit a fibrinous exudate.

48.     Defendants failed to warn that the Ethicon Multi-Layered Hernia Mesh creates a solid barrier preventing the body from adequately clearing or transporting fluid, which results in seroma formation, potentiating infections and fistula formation.

49.     Defendants never performed any clinical trials and/or studies prior to marketing the Ethicon Multi-Layered Hernia Mesh.

50.     Defendants did not fully and/or adequately test the configuration of this new, multi-layered hernia mesh, designed with ORC, polypropylene, and PDS, that was implanted into Plaintiff Michael Dattolico.

51.     Although the United States does not have a complete and accurate database to track problems with hernia mesh implants, controlled studies have investigated the problems with the Ethicon Multi-Layered Hernia Mesh.

52.     A single center study was conducted in Belgium, where three surgeons implanted only the Ethicon Proceed in 101 patients between April 2009 and December 2011. The Ethicon Proceed was able to be visualized by ultrasound in 47 patients. Of those 47 patients, 10 were noted to have mesh contraction. The Ethicon Proceed "was removed during the operation in four patients and important centripetal contraction of the mesh, diminishing the surface area, was observed in all cases." The authors concluded the Proceed has "demonstrated an in vivo centripetal shrinkage percentage of up to 77% in some patients. This finding of mesh contraction

was confirmed in those patients that were reoperated for recurrence and in 21% of the patients where the radiologist was able to visualize the mesh. The overlap obtained with a mesh of 6.4cm in diameter was insufficient with hernias larger than 2 cm. Therefore, we recommend not to use PVP (Proceed Ventral Patch) in hernias of 2 cm or more." The authors go on to note that their study is likely underpowered as "Most recurrences after ventral hernia repair occur within 2 years after the operation. Since our study had a mean follow-up of 16 months, it is likely that a longer follow-up would yield a higher recurrence rate."[4]

53.     In 2015, another study in Belgium confirmed "massive shrinkage" with the Ethicon Proceed. The authors concluded that "This can however not be considered the ideal indication for a mesh device repair with a suggested mesh overlap of at least 5 cm for incisional hernias."[5]

54.     Defendants continue to market the Ethicon Multi-Layered Hernia Mesh without warning of the massive mesh shrinkage or the necessary overlap to prevent early hernia recurrence due to mesh shrinkage.

55.     Reassurances of device safety were made through direct promotional contact by Defendants' sales representatives and distributors, through word-of-mouth from Defendants' physician/technical consultants, and/or through industry-targeted promotional materials.

56.     Despite these reassurances, the defective design and manufacture of the Ethicon Multi-Layered Hernia Mesh continued to elicit severe and chronic inflammatory responses, resulting in adhesion formation, bowel injuries, mesh contracture, pain, hernia recurrence, infections, seromas, fistulas, erosion, extrusion, and additional complications.

---

[4] J. Bontinck, Single Centre Observational Study to Evaluate the Safety and Efficacy of the Proceed Ventral Patch to Repair Small Ventral Hernias, 18 Hernia 671, Clinical.Trials.gov: NCT01307696 (2013).
[5] E. Reynvoet, Intraperitoneal Mesh Devices for Small Midline Hernias: Mesh Behavior in a Porcine Model, 19 Hernia 955 (2015).

57.     Defendants were aware that the ORC layer was ineffective in preventing adhesions to the polypropylene; gamma irradiation would weaken the polypropylene; and the nine-layer mesh would contract massively over time. Nonetheless, Defendants employed the design in the Ethicon Proceed Ventral Patch in reckless disregard for the safety of patients, including Plaintiff Michael Dattolico.

58.     Moreover, despite direct knowledge of significant adverse events reported by patients and physicians, as well as awareness of failures that have been reported in literature and published clinical trials, Defendants have continued to market the Ethicon Multi-Layered Hernia Mesh as being safe and effective for hernia repair.

59.     From the time Defendants first began selling the Ethicon Multi-Layered Hernia Mesh in the United States through today, product labeling and the product information failed to contain adequate information, instructions, and warnings concerning the following: implantation of the Proceed, specifically its propensity to massively shrink, the increased in duration and intensity of inflammation, and the elevated rate of adhesions, bowel complications, chronic pain, hernia recurrence, seroma formation, hematoma formation, fistula formation, erosion, extrusion, infection, and other injuries occurring at a higher rate than other surgically implanted devices.

### USE OF THE PRODUCT

60.     A defectively designed, manufactured and marketed Ethicon Multi-Layered Hernia Mesh left the hands of Defendants in its defective condition and was delivered into the stream of commerce. Dr. Jose Yeguez implanted the Proceed Ventral Patch in Michael Dattolico's abdomen to repair an umbilical hernia on or about November 9, 2012, at Boca Raton Regional Hospital, in Boca Raton, Florida. Michael Dattolico was implanted with a 6.4 cm x 6.4 cm Proceed Ventral Patch, Model No. PVPM, Lot EE8BQGZO.

61.     As a direct and proximate result of Defendants' defective design, manufacture, marketing, distribution, and/or sale of the Ethicon Multi-Layered Hernia Mesh and placing the defective product into the stream of commerce, Plaintiff Michael Dattolico has been injured and damaged as follows:

a.      On or about April 30, 2015, Michael Dattolico underwent partial removal of the Ethicon Proceed Ventral Patch at Florida Celebration Health in Kissimmee, Florida, by Dr. Eduardo Davilla. Upon visualizing the Ethicon Proceed, the surgeon found that the bowel was severely adhered to the mesh. The surgeon also noted trauma to the bowel and that it was impossible to separate the bowel from the mesh. The surgeon noted he had an enterotomy and had to perform a bowel resection.

b.      On or about September 15, 2015, Michael Dattolico underwent removal of the Ethicon Proceed Ventral Patch at Boca Raton Regional Hospital in Boca Raton, Florida, by Dr. Jose Yeguez. Upon visualizing the Ethicon Proceed, the surgeon noted dense adhesions and that the mesh was connecting the previous anastomosis with a loop of small bowel.  The surgeon deemed it impossible to remove the old mesh from the previous anastomosis and, thus, a small bowel resection was required. The hernia defect was repaired using a Phasix Mesh.

c.      Michael Dattolico experienced and/or continues to experience severe pain, nausea, diarrhea, constipation, inflammation and loss of appetite, which has impaired his activities of daily living.

d.      Michael Dattolico continues to suffer complications as a result of his implantation with the Ethicon Proceed.

e.      Michael Dattolico is at a higher risk of severe complications during an abdominal surgery, to the extent that future abdominal operations might not be feasible.

62.     The mechanism of failure in Michael Dattolico's device was a mechanism of failure that Defendants had marketed and warranted would not occur because of the Ethicon Multi-Layered Hernia Mesh design and composition. It was also the same failure mechanism that

the medical and scientific community had been studying and documenting since the 1990s, *i.e.,* ORC was ineffective at preventing adhesions to polypropylene, and polypropylene contracts when dense adhesions form to it.

63.     Moreover, the symptoms and findings associated with Ethicon Multi-Layered Hernia Mesh product failures that have been reported in the literature are identical to those Michael Dattolico suffered.

64.     As a direct and proximate result of Defendants' defective design, manufacturing, marketing, distribution, sale and warnings of the defective Ethicon Multi-Layered Hernia Mesh, Michael Dattolico has suffered and continues to suffer both injuries and damages, including, but not limited to: past, present and future physical and mental pain and suffering; physical disability, and past, present, and future medical, hospital, rehabilitative, and pharmaceutical expenses, and other related damages.

### THE FDA'S 510(k) CLEARANCE PROCESS

65.     The 510(k) clearance process refers to Section 510(k) of the Medical Device Amendments of 1976 MDA of the Federal Food, Drug and Cosmetic Act. Under this process, device manufacturers are only required to notify the FDA at least 90 days before they market a device claimed to be "substantially equivalent" to a device the FDA approved for sale prior to 1976, when the MDA was enacted.

66.     No clinical testing is required under this process.

67.     Subsequent amendments to the MDA allowed for 510(k) clearance of products deemed "substantially equivalent" to post-MDA, 510(k) cleared devices.

68.     Through this domino effect, devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices approved for sale by the FDA prior to

1976 could be sold to patients in a matter of 90 days without any clinical testing.

69.     Clearance for sale under the 510(k) process does not equate to FDA approval of the cleared device.

70.     In 2012, at the request of the FDA, the National Institute of Health (NIH) conducted a thorough review of the 510(k) process, coming to the following major conclusion:

> **The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.**

71.     The NIH explained, "The assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'" Further, the NIH even pointed out that the classification of predicate devices approved for sale prior to the 1976 MDA "did not include any evaluation of the safety and effectiveness of individual medical devices . . . Thus is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process."

72.     Defendants cleared the Ethicon Proceed Ventral Patch, and its related components, under the 510(k) Premarket Notification. Under Section 510(k) of the Federal Food, Drug and Cosmetic Act, a medical device does not have to go through the rigors of a clinical study to gain approval by the FDA. Instead, the device was supposed to demonstrate substantial equivalence to a predicate medical device.

73.     On June 18, 2002, the Food and Drug Administration issued a document titled

"Guidance for Resorbable Adhesion Barrier Devices for Use in abdominal and/or Pelvic

Surgery; Guidance for Industry." The 26 page document starts by explaining:

> **FDA has determined that the resorbable adhesion barrier is a significant risk device as defined in 21 CFR 812.3(m)(4). The resorbable adhesion barrier is a class III device which is subject to <u>premarket approval</u> in accordance with section 515 of the Federal Food, Drug, and Cosmetics (FD&C) Act.**

74.     The Proceed Surgical Mesh did not undergo premarket approval, but instead

received 510(k) clearance on or about September 17, 2003. The only predicate device listed on

the 510(k) application is the Prolene Soft Polypropylene Mesh, a non-barrier hernia mesh.

Defendants did not claim that the Proceed Surgical Mesh was a resorbable adhesions barrier in

their 510(k) application. However, after 510(k) clearance, Defendants marketed the Proceed

Surgical Mesh as a resorbable adhesion barrier.

75.     Defendants applied for 510(k) clearance for the Proceed Surgical Mesh again in

May of 2006. The only predicate device listed on the 510(k) application is the prior Proceed

Surgical Mesh. In this 510(k) application, Defendants did not claim the intended use of the

Proceed was a resorbable adhesion barrier; however, in the device description Defendants note

that the "ORC side provides a bioresorbable layer that physically separates the polypropylene

mesh from underlying tissue and organ surfaces during the wound-healing period to minimize

tissue attachment to the mesh." Defendants continued to market the Proceed Surgical Mesh as a

resorbable adhesion barrier.

76.     Defendants applied for 510(k) clearance for the Proceed Ventral Patch in

December of 2006. Defendants do not mention in the 510(k) application for the Proceed Ventral

Patch that the mesh is intended to act as a resorbable adhesion barrier. After 510(k) clearance,

Defendants marketed and continue to market the Proceed Ventral Patch as a resorbable adhesion barrier. Even the Ethicon Proceed IFU notes "The ORC side of the patch provides a bioresorbable layer that physically separates the polypropylene mesh from underlying tissue and organ surfaces while minimizing tissue attachment to the polypropylene mesh during the critical wound healing period."

## COUNT I: STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN

77.     Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

78.     Defendants had a duty to design and manufacture, distribute, market, promote and sell, the Ethicon Multi-Layered Hernia Mesh so that it was neither defective nor unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed and sold.

79.     In and before 2003, Defendants were engaged in the business of designing, manufacturing, marketing, distributing and selling hernia mesh implants and did design, manufacture, distribute, market and sell the Ethicon Multi-Layered Hernia Mesh.

80.     Defendants expected the Ethicon Multi-Layered Hernia Mesh Devices they were manufacturing, selling, distributing, supplying, and/or promoting to reach, and they did in fact reach, implanting physicians and consumers in the State of Florida and the United States, including Plaintiff Michael Dattolico and his implanting physician, without substantial change in their condition.

81.     At the time the Ethicon Multi-Layered Hernia Mesh left Defendants' possession and the time the Ethicon Proceed entered the stream of commerce in the State of Florida, it was in an unreasonably dangerous or defective condition. These defects include, but are not limited to the following:

- the Ethicon Multi-Layered Hernia Mesh was not reasonably safe as intended to be used;
- the Ethicon Multi-Layered Hernia Mesh had an inadequate design for the purpose of hernia repair;
- the Ethicon Multi-Layered Hernia Mesh contained unreasonably dangerous design defects, including a large pore ORC layer that is ineffective at preventing adhesion formation to the underlying polypropylene;
- the Ethicon Multi-Layered Hernia Mesh is unreasonably dangerous, due to the degraded state of the polypropylene utilized, which has been exposed to gamma irradiation;
- the Ethicon Multi-Layered Hernia Mesh contained unreasonably dangerous design defects, utilizing multiple layers, which increases and prolongs the inflammatory response;
- the Ethicon Multi-Layered Hernia Mesh was not appropriately or adequately tested before distribution; and
- the Ethicon Multi-Layered Hernia Mesh had an unreasonably high propensity for adhesion formation, mesh contracture, hernia recurrence, chronic pain, bowel complications, seroma formation, fistula formation, hematoma formation, infection, erosion, and extrusion.

82.    At the time the Defendants' initial design, manufacture, marketing, and sale of the Ethicon Multi-Layered Hernia Mesh, a feasible, alternative safer design for the Ethicon Proceed was known and available, including, but not limited to, a flat, non-coated, single-layer mesh placed away from the bowel.

83.    At the time subsequent to Defendants' initial design and manufacture and marketing and sale of the Ethicon Multi-Layered Hernia Mesh, including before Michael Dattolico's hernia surgery, Defendants had the ability to eliminate the unsafe character of the Ethicon Multi-Layered Hernia Mesh without impairing its usefulness.

84.    Had the Defendants properly and adequately tested the Ethicon Multi-Layered Hernia Mesh, they would have discovered that the ORC layer was ineffective at preventing adhesion formation to the polypropylene; multiple layers increase and prolong the inflammatory response; the mesh experiences significant contraction over time; recurrence rates are

unacceptably high; the polypropylene was too weak; and that these defects result in bowel obstructions, seromas, fistulas, infections, erosion, extrusion, a pronounced foreign body response, among other complications.

85.     The Ethicon Multi-Layered Hernia Mesh, manufactured, supplied, distributed, marketed, promoted and sold by Defendants, were therefore defective in design for formulation in that, when it left Defendants, the foreseeable risk of harm from the product exceeded or outweighed the benefit or utility of the consumer would expect, and/or it failed to comply with federal requirements for these medical devices.

86.     As a direct and proximate result of Defendants' wrongful conduct, including the defective and dangerous design and inadequate warnings or the Ethicon Multi-Layered Hernia Mesh, Plaintiff Michael Dattolico has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of medical care, rehabilitation, lost income, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

87.     Defendants are strictly liable in tort to Plaintiffs for their wrongful conduct.

### <u>COUNT II: – STRICT PRODUCTS LIABILITY – FAILURE TO WARN</u>

88.     Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

89.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the Ethicon Multi-Layered Hernia Mesh; and directly advertised or marketed the product to the FDA, health care professionals, and consumers, including Plaintiff Michael Datolico. Therefore, Defendants had a duty to warn of the risks associated with the use of the Ethicon Multi-Layered Hernia Mesh.

90.     Defendants distributed and sold the Ethicon Multi-Layered Hernia Mesh in their original form of manufacture, which included the defects described herein.

91.     The Ethicon Multi-Layered Hernia Mesh was expected to and did reach Plaintiff Michael Dattolico and his implanting physician, without substantial change or adjustment in its condition as manufactured and sold by Defendants.

92.     Each Ethicon Multi-Layered Hernia Mesh designed, developed, tested, manufactured, distributed, promoted, marketed, and/or sold or otherwise placed into the stream of commerce by Defendants, was in a dangerous and defective condition and posed a threat to any user or consumer.

93.     At all material times, Plaintiff Michael Dattolico was the person the Defendants should have considered to be subject to the harm caused by the defective nature of the Ethicon Multi-Layered Hernia Mesh.

94.     The Ethicon Multi-Layered Hernia Mesh was implanted in Plaintiff Michael Dattolico and used in a manner for which it was intended.

95.     This use has resulted in severe physical, financial, emotional and other injuries to Plaintiff Michael Dattolico.

96.     Defendants failed to adequately warn health care professionals and the public, including Plaintiff Michael Dattolico and his implanting physician, of the true risks of the Ethicon Multi-Layered Hernia Mesh, which was ineffective at protecting underlying organs from adhesion formation and would contract significantly upon implantation, resulting in significant pain, bowel and other organ complications, hernia recurrence, reoperation, infections, fistulas, seromas, hematomas, erosion, extrusion, subsequent operations, and more.

97.     Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the Ethicon Multi-Layered Hernia Mesh. Had they done so, proper warnings would have been heeded and no health care professional, including Michael Dattolico's physician, would have used the Ethicon Multi-Layered Hernia Mesh, or no consumer, including Michael Dattolico, would have purchased and/or consented to the use of the Ethicon Multi-Layered Hernia Mesh.

98.     Defendants failed to timely and reasonably provide adequate instructions and training concerning safe and effective use of the Ethicon Multi-Layered Hernia Mesh.

99.     The Ethicon Multi-Layered Hernia Mesh, which Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce, was defective due to inadequate post-marketing warnings and/or instruction because Defendants knew or should have known that there was reasonable evidence of an association between the Ethicon Multi-Layered Hernia Mesh and dense adhesion formation, mesh contracture, and hernia recurrence, causing serious injury and pain. Nonetheless, Defendants failed to provide adequate warnings to health care professionals and the consuming public, including Plaintiff Michael Dattolico, and continued to aggressively promote the Ethicon Multi-Layered Hernia Mesh.

100.     The Ethicon Multi-Layered Hernia Mesh, which Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce, was defective due to inadequate post-marketing warnings and/or instruction regarding the increased risk of failure of the Ethicon Proceed resulting in revision surgery, although Defendants knew of a safer alternative design including, but not limited to, a flat, non-coated, single-layer mesh placed away from the bowel.

101.    Defendants failed to perform or otherwise facilitate adequate testing; failed to reveal and/or concealed testing and research data; and selectively and misleadingly revealed and/or analyzed testing and research data.

102.    Plaintiff Michael Dattolico and his physician used the Ethicon Multi-Layered Hernia Mesh for its intended purpose, *i.e.*, hernia repair.

103.    Michael Dattolico could not have discovered any defect in the Ethicon Multi-Layered Hernia Mesh through the exercise of due care.

104.    Defendants, as designers, manufacturers, distributors, promoters, marketers and/or sellers of medical devices are held to the level of knowledge of experts in their field.

105.    Neither Plaintiff Michael Dattolico nor his implanting physician had substantially the same knowledge about the Ethicon Multi-Layered Hernia Mesh as Defendants.

106.    Defendants reasonably should have known the Ethicon Multi-Layered Hernia Mesh was unsuited to repair a hernia in Plaintiff Michael Dattolico.

107.    As a direct and proximate result of Defendants' failure to adequately communicate a warning and/or failure to provide an adequate warning and other wrongful conduct, Michael Dattolico has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages, as set forth in this Complaint.

108.    Defendants are strictly liable in tort to Plaintiffs for their wrongful conduct.

**COUNT III: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT**

109.    Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

110.    Defendants designed, developed, manufactured, tested, packaged, advertised, promoted, marketed, distributed, labeled and/or sold the Ethicon Multi-Layered Hernia Mesh, in

a condition which rendered it unreasonably dangerous due to it propensity to result in early failure of the device. The Ethicon Multi-Layered Hernia Mesh was unreasonably dangerous in construction or composition.

111.    The Ethicon Multi-Layered Hernia Mesh Defendants manufacture was defective in construction or composition in that, when it left the hands of Defendants, it deviated in a material way from their manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula. Defendants knew or should have known that the Ethicon Multi-Layered Hernia Mesh could fail early in patients, thereby giving rise to pain and suffering, debilitation and the need for revision surgery to replace the device with the attendant risk of complications and death from such further surgery, Defendants continued to market the Ethicon Multi-Layered Hernia Mesh as a safe and effective absorbable barrier hernia mesh.

112.    As a direct and proximate result of the use of the subject product as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff Michael Dattolico suffered harm, damages and economic loss as previously described and will continue to suffer such harm, damages and economic loss in the future.

113.    Defendants are strictly liable in tort to Plaintiffs for their wrongful conduct.

## COUNT IV: NEGLIGENCE

114.    Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

115.    Although Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training, and preparing written instructions and warnings for the Ethicon Multi-Layered Hernia Mesh, they failed to do so.

116.    Defendants knew, or in the exercise of reasonable care should have known, that the Ethicon Multi-Layered Hernia Mesh was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients like Plaintiff Michael Dattolico in whom the Ethicon Multi-Layered Hernia Mesh was implanted. They also knew or should have known that Plaintiff Michael Dattolico and his physicians were unaware of the dangers and defects inherent in the Ethicon Multi-Layered Hernia Mesh.

117.    As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training and preparing written instructions and warnings for the Ethicon Multi-Layered Hernia Mesh, Plaintiff Michael Dattolico suffered injuries and damages as summarized in this Complaint.

## COUNT V: BREACH OF IMPLIED WARRANTY

118.    Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

119.    At the time Defendants designed, manufactured, produced, tested, studied, inspected, labeled, marketed, advertised, sold, promoted and distributed the Ethicon Multi-Layered Hernia Mesh for use by Plaintiff Michael Dattolico, they knew of the intended use of the Ethicon Multi-Layered Hernia Mesh, and impliedly warranted their product to be of merchantable quality, and safe and fit for its intended use.

120.    When the Ethicon Multi-Layered Hernia Mesh was implanted in Plaintiff Michael Dattolico to treat his hernia, the Ethicon Multi-Layered Hernia Mesh was being used for the ordinary purposes for which it was intended.

121.    Plaintiff Michael Dattolico, individually and/or by and through his physicians, relied upon Defendants' implied warranties of merchantability in consenting to have the Ethicon Multi-Layered Hernia Mesh implanted in him.

122.    Contrary to such implied warranties, the Ethicon Multi-Layered Hernia Mesh was

not of merchantable quality, and was not safe and/or was not fit for its intended use. The Ethicon Multi-Layered Hernia Mesh was unreasonably dangerous and unfit for the ordinary purposes for which it was used. Defendants failed to warn of known or reasonably scientifically knowable defects in the Ethicon Multi-Layered Hernia Mesh.

123.    As a direct and proximate result of the conduct of Defendants, Plaintiff Michael Dattolico has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of medical care, rehabilitation, lost income, and pain and suffering, for which she is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VI: BREACH OF EXPRESS WARRANTY

124.    Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

125.    At all relevant times, Defendants manufactured, distributed, advertised, promoted, and sold the Ethicon Multi-Layered Hernia Mesh.

126.    At all relevant times, Defendants intended the Ethicon Multi-Layered Hernia Mesh be used in the manner that Plaintiff Michael Dattolico in fact used it and Defendants expressly warranted in its brochures and advertising that each product was safe and fit for use by consumers, that it was of merchantable quality, that its side effects were minimal and comparable to other Proceed, and that it was adequately tested and fit for its intended use.

127.    At all relevant times, Defendants were aware that consumers, including Plaintiff Michael Dattolico, would use the Ethicon Multi-Layered Hernia Mesh. Therefore, Plaintiff Michael Dattolico was a foreseeable user of Defendants' Ethicon Multi-Layered Hernia Mesh.

128.    Plaintiff Michael Dattolico and/or his implanting physician were at all relevant times in privity with Defendants.

129. Defendants' Ethicon Multi-Layered Hernia Mesh was expected to reach and did in fact reach consumers, including Plaintiff Michael Dattolico and his implanting physician, without substantial change in the condition in which it was manufactured and sold by Defendants.

130. Defendants breached various express warranties with respect to the Ethicon Multi-Layered Hernia Mesh, including the following particulars:

- Defendants represented to Plaintiff Michael Dattolico and his physicians and healthcare providers through their labeling, advertising marketing materials, detail persons, seminar presentations publications, notice letters, and regulatory submissions that the Ethicon Proceed was safe and fraudulently withheld and concealed information about substantial risks or serious injury and/or death associated with using the Ethicon Proceed;

- Defendants represented to Plaintiff Michael Dattolico and his physicians and healthcare providers that their Ethicon Proceed was as safe, and/or safer than other alternative procedures and devices and fraudulently concealed information, which demonstrated that the Ethicon Proceed was not safer than alternatives available on the market; and

- Defendants represented to Plaintiff Michael Dattolico and his physicians and healthcare providers that the Ethicon Proceed was more efficacious than other alternatives and fraudulently concealed information regarding the true efficacy of the Ethicon Proceed.

131. In reliance upon Defendants' express warranty, Plaintiff Michael Dattolico was implanted with Defendants' Ethicon Multi-Layered Hernia Mesh as prescribed and directed, and therefore, in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

132. At the time of making such express warranties, Defendants knew or should have known that the Ethicon Multi-Layered Hernia Mesh does not conform to these express

representations because the Ethicon Multi-Layered Hernia Mesh was not safe and had numerous serious side effects, many of which Defendants did not accurately warn about, thus making the Ethicon Multi-Layered Hernia Mesh unreasonably unsafe for its intended purpose.

133.    Members of the medical community, including physicians and other healthcare professionals, as well as Plaintiff Michael Dattolico and the public, relied upon the representations and warranties of Defendants in connection with the use recommendation, description, and/or dispensing of the Ethicon Multi-Layered Hernia Mesh.

134.    Defendants breached their express warranties to Plaintiff Michael Dattolico in that the Ethicon Multi-Layered Hernia Mesh was not of merchantable quality, safe, and fit for its intended purpose, nor was it adequately tested.

135.    As a direct and proximate result of Defendants' conduct, Plaintiff Michael Dattolico has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses, and other damages as described in this Complaint.

## COUNT VII: GROSS NEGLIGENCE

136.    Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

137.    The wrongs done by defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiffs for which the law would allow, and which Plaintiffs will seek at the appropriate time under governing law for the imposition of exemplary damages, in that Defendants' conduct, including the failure to comply with applicable Federal standards, was specifically intended to cause substantial injury to Plaintiffs or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but

nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or included a material representation that was false, with Defendants, knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiffs and in which Plaintiffs indeed relied upon and suffered injury as a proximate result.

138.   Plaintiffs therefore will seek to assert claims for exemplary damages at the appropriate time under governing law in an amount within the jurisdictional limits of the Court.

139.   Plaintiffs also alleges that the acts and omissions of named Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiffs. In that regard, Plaintiffs will seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

## COUNT VIII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

140.   Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

141.   Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed and sold the Ethicon Multi-Layered Hernia Mesh to Plaintiff Michael Dattolico.

142.   Defendants carelessly and negligently concealed the harmful effects of the products from Plaintiff Michael Dattolico and/or his physician on multiple occasions and continue to do so to this day.

143.   Defendants carelessly and negligently misrepresented the quality, safety and efficacy of the Ethicon Multi-Layered Hernia Mesh to Plaintiff Michael Dattolico and/or his physician on multiple occasions and continue to do so to this day.

144.    Plaintiffs were directly impacted by Defendants' carelessness and negligence, in that she has sustained, and will continue to sustain, emotional distress, severe physical injuries, economic losses, and other damages as a direct result of the decision to purchase the Ethicon Multi-Layered Hernia Mesh.

145.    Defendants continued to carelessly and negligently misrepresent the quality, safety, efficacy, dangers and contraindications of the Ethicon Multi-Layered Hernia Mesh to Plaintiff Michael Dattolico and/or his physician, after he sustained emotional distress, severe physical injuries, and economic loss.

146.    Defendants continued to carelessly and negligently misrepresent the quality, safety, efficacy, dangers and contraindications of the products to Plaintiff Michael Dattolico and/or his physician, knowing that doing so would cause her to suffer additional and continued emotional distress, severe physical injuries, and economic loss.

147.    As a proximate result of Defendants' conduct, Plaintiff Michael Dattolico has been injured, sustained severe and permanent pain, suffering, anxiety, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

148.    Plaintiff Michael Dattolico has suffered and will continue to suffer physical pain and suffering, as well as mental anguish and emotional distress.

149.    Plaintiff Michael Dattolico has also incurred substantial medical bills and has suffered loss of other monies due to the defective Ethicon Multi-Layered Hernia Mesh that was implanted.

## COUNT IX: FRAUDULENT CONCEALMENT

150.    Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

151.    At all material times Defendants knew or should have known that the Ethicon

Multi-Layered Hernia Mesh caused large numbers of complications. Moreover, they knew or should have known that the surgical technique and training of implanting physicians was not the cause of the adverse events associated with these devices; the safety and efficacy of the Ethicon Multi-Layered Hernia Mesh had not been proven with respect to, among other things, the products, their components, their performance, and their method of insertion; and that the products were not safe and effective. Defendants continued to represent that it was safe and effective.

152.   Although Defendants knew or should have known about the lack of safety and efficacy of the Ethicon Multi-Layered Hernia Mesh, they failed to disclose this information to Plaintiff Michael Dattolico, and/or the treating physicians, and/or the public at large.

153.   At all material times, Defendants had the duty and obligation to disclose to Plaintiff Michael Dattolico and/or his physicians the true facts concerning the Ethicon Multi-Layered Hernia Mesh, i.e., their dangerous and defective nature, their lack of efficacy for their purported use and lack of safety in normal use, and their likelihood to cause serious consequences to users, including permanent and debilitating injuries. Defendants concealed these material facts before Plaintiff Michael Dattolico was implanted with the Ethicon Multi-Layered Hernia Mesh.

154.   Defendants were under a duty to Plaintiff Michael Dattolico to disclose and warn them of the defective nature of the products because:

      (a)   Defendants were in a superior position to know the products' true quality, safety, and efficacy;

      (b)   Defendants knowingly made false claims about the products' safety and quality in documents and marketing materials; and

      (c)   Defendants fraudulently and affirmatively concealed the defective nature of the products from Plaintiff Michael Dattolico.

155.    The facts Defendants concealed and/or did not disclose to Plaintiff Michael Dattolico were material facts that a reasonable person would have considered important in deciding whether to purchase and/or use the Ethicon Multi-Layered Hernia Mesh.

156.    At all material times, Defendants willfully, intentionally, and maliciously concealed facts from Plaintiff Michael Dattolico and/or his physician, with the intent to defraud.

157.    Defendants intentionally concealed and/or failed to disclose the true defective nature of the Ethicon Multi-Layered Hernia Mesh so that Plaintiff Michael Dattolico would request and purchase the product; and/or her healthcare providers would dispense, use, and recommend the product. Plaintiffs justifiably acted or relied upon the concealed and/or non-disclosed facts to their detriment.

158.    At all material times, neither Plaintiff Michael Dattolico nor his physician were aware of the facts.

159.    Had they been so aware, they would not have reasonably relied upon the representations of safety and efficacy and would not have utilized the Ethicon Multi-Layered Hernia Mesh. Defendants' failure to disclose this information was a substantial factor in Plaintiff Michael Dattolico's physician's selection of the Ethicon Multi-Layered Hernia Mesh. The failure to disclose also resulted in the provision of incorrect and incomplete information to Plaintiff Michael Dattolico as a patient.

160.    As a direct and proximate result of this conduct, Plaintiff Michael Dattolico was injured as described in this Complaint.

161.    Plaintiff Michael Dattolico has suffered and will continue to suffer physical pain and suffering, as well as mental anguish and emotional distress.

162.    Plaintiff Michael Dattolico has also incurred substantial medical bills and has

suffered loss of other monies due to the defective Ethicon Multi-Layered Hernia Mesh that was implanted.

## COUNT X: NEGLIGENT MISREPRESENTATION

163.    Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

164.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff and/or the public, that the Ethicon Multi-Layered Hernia Mesh had not been adequately tested and found to be a safe and effective treatment. Defendants' representations were in fact false.

165.    Defendants failed to exercise ordinary care in their representations concerning the Ethicon Multi-Layered Hernia Mesh while involved in the manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce of the products, because they negligently misrepresented the products' risk of unreasonable and dangerous adverse side effects.

166.    Defendants breached their duty by representing to Plaintiff Michael Dattolico and/or his physician, and/or the medical community that the Ethicon Multi-Layered Hernia Mesh has no serious side effects different from older generations of similar products or procedures.

167.    As a foreseeable, direct, and proximate result of Defendants' negligent misrepresentations, they knew, or had reason to know, that the Ethicon Multi-Layered Hernia Mesh had been insufficiently tested, or had not been tested at all; and that the products lacked adequate and accurate warnings, and created a high risk—and/or higher than acceptable or reported and represented risk—of adverse side effects, including pain, graft rejection, graft migration, organ damage, complex seroma, fistula, sinus tract formation, dense adhesions, delayed wound closure, infection, sepsis, and death.

168.    As a direct and proximate result of Defendants' conduct, Plaintiff Michael Dattolico has been injured and sustained past and future severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

169.    Plaintiff Michael Dattolico has suffered and will continue to suffer physical pain and suffering, as well as mental anguish and emotional distress.

170.    Plaintiff Michael Dattolico has also incurred substantial medical bills and has suffered loss of other monies due to the defective Ethicon Multi-Layered Hernia Mesh that was implanted.

## PUNITIVE DAMAGES

171.    Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

172.    Plaintiff Michael Dattolico is entitled to punitive damages because Defendants' wrongful acts and/or omissions were wanton or in conscious disregard of the rights of others. Defendants misled both the medical community and the public at large, including Plaintiff Michael Dattolico, by making false representations about the safety and efficacy of the Ethicon Multi-Layered Hernia Mesh and by failing to provide adequate instructions and training concerning its use. Defendants downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of the Ethicon Multi-Layered Hernia Mesh, despite available information demonstrating that the Ethicon Multi-Layered Hernia Mesh lacked adequate testing, was ineffective at preventing adhesion formation of polypropylene, would significantly contract upon implantation, would fail early, and would cause an increased and prolonged inflammatory and foreign body response, high rates of bowel complications, seromas, infections, fistulas, pain, and other harm to patients. Such risk and adverse effects could easily have been avoided had Defendants not concealed knowledge of the

serious and permanent side effects and risks associated with the use of the Ethicon Multi-Layered Hernia Mesh or provided proper training and instruction to physicians regarding use of the Ethicon Multi-Layered Hernia Mesh. Defendants' misrepresentations included knowingly withholding material information from the FDA, the medical community and the public, including Michael Dattolico, concerning the safety of the Ethicon Multi-Layered Hernia Mesh.

173.   Defendants were or should have been in possession of evidence demonstrating that the Ethicon Multi-Layered Hernia Mesh caused serious side effects. Nevertheless, Defendants continued to market the Ethicon Multi-Layered Hernia Mesh by providing false and misleading information with regard to its safety and efficacy.

174.   Defendants failed to provide warnings that would have dissuaded health care professionals from using the Ethicon Multi-Layered Hernia Mesh, thus preventing health care professionals and consumers, including Michael Dattolico, from weighing the true risks against the benefits of using the Ethicon Multi-Layered Hernia Mesh.

175.   Defendants failed to provide adequate training, testing and instructions to physicians that could have prevented failure of the Ethicon Multi-Layered Hernia Mesh causing serious harm and suffering to patients, including Michael Dattolico.

WHEREFORE, Plaintiffs demands judgment against Defendants for compensatory damages and punitive damages, together with interest, cost of suit and attorney's fees and such other relief as the Court deems proper.

## **LOSS OF CONSORTIUM**

176.   Plaintiffs incorporate by reference the allegations in paragraphs 1-76.

177.   Plaintiff Joan Dattolico was and is the lawful spouse of Plaintiff Michael Dattolico and in such capacity, was and is entitled to the comfort, enjoyment, society, and

services of her spouse.

178.    As a direct and proximate result of the foregoing allegations, Plaintiff Joan Dattolico was deprived of the comfort, enjoyment, society, and services of her spouse, has suffered and will continue to suffer economic loss, and otherwise has been emotionally and economically injured.  Plaintiff Joan Dattolico and Michael Dattolic's injuries and damages are permanent and will continue into the future.

179.    Accordingly, Plaintiffs demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages or enhanced compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

Plaintiffs demand judgment against Defendants, and each of them, individually, jointly and severally and pray for the following relief in accordance with applicable law and equity:

i.    Compensatory damages to Plaintiffs for past, present, and future damages, including but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff Michael Dattolico, permanent impairment, mental pain and suffering, loss of enjoyment of life, loss of consortium, health and medical care costs, economic damages, together with interest and costs as provided by law;

ii.    Restitution and disgorgement of profits;

iii.   Punitive damages;

iv.    Reasonable attorneys' fees as provided by law;

v.     Past and future cost of all proceedings;

vi.    All ascertainable economic damages;

vii.   Prejudgment interest on all damages as allowed by law;

viii.  Loss of consortium; and

ix.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:  April 29, 2019

Respectfully submitted,


*/s/ Robert E. Price, Esq*
Robert E. Price, Esq.
*rprice@levinlaw.com*
Florida Bar No: 85284
A. Renee Preston, Esq.
rpreston@levinlaw.com
Florida Bar No: 639801
Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.
316 South Baylen Street, Suite 400
Pensacola, FL 32502
Tel:     850-435-7076
Fax:     850-436-6076
*Attorneys for Plaintiff*